UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES G. COLLINS, et al.<br><br>                              Appellants,<br><br>v.<br><br>NANCY L. WOLF,<br><br>                               Appellee. | Case No.: 17-CV-2066 JLS (BLM)<br>Bankruptcy No.: 11-19790-LT7<br><br>**ORDER AFFIRMING<br>BANKRUPTCY COURT**<br><br>(ECF No. 1) |

Presently before the Court is Appellants Charles G. Collins, Chadwick C. Collins, and Janelle Collins's appeal from the Bankruptcy Court's order entering judgment in favor of Appellee Nancy L. Wolf. (ECF No. 1.) Appellants filed an amended opening brief, ("Appellant Br.," ECF No. 9), Appellee filed an answering brief, ("Appellee Br.," ECF No. 16), and Appellants then filed a reply brief, ("Reply," ECF No. 17). Having considered the parties' arguments, the record on appeal, and the law, the Court rules as follows.

## BACKGROUND

This lawsuit arises out of a Chapter 7 bankruptcy filing by Debtor-Appellant Chadwick Collins ("Chadwick") and the sale of a property located at 1480 Beechtree Road, San Marcos, California 92078 ("the Property"). Chadwick and his spouse, Janelle Collins ("Janelle"), purchased the Property on December 19, 2000, and took title from a third party developer, Shea Homes Limited Partnership. (Excerpt of Record ("ER"), ECF No. 9-1, at

62.)[1]  The grant deed from Shea Homes to the Collins was granted to "Husband and Wife as Joint Tenants."  (*Id.*)  Only the third-party developer signed the deed.  (*Id.*)  In 2002, the Collins subsequently decided to sell the property to Chadwick's father, Charles Collins ("Charles").

In August 2002, Charles drafted a Purchase Agreement identifying Chadwick and Janelle as "Sellers" and Charles as "Purchaser."  (*Id.* at 65.)  The Purchase Agreement intended to transfer the Collins' interest in the property to Charles, with title to be held in joint tenancy between Charles and a family trust ("The Collins Family Trust").  The Purchase Agreement quoted a $385,000.00 purchase price, which was comprised of a $93,000 down payment Charles would pay to Chadwick and Janelle and Charles' assumption of Chadwick and Janelle's $292,000 mortgage.  (*Id.*)  Chadwick later testified that he understood that the Purchase Agreement meant that Charles would make all loan payments and Chadwick would no longer be responsible for loan payments.  (Appellee Br. 13.)  However, Charles never assumed the existing loan and the loan remained in Chadwick's name.  (*Id.* at 14.) The agreement also provided that, "upon closing," title to the Property would be held by Charles in joint tenancy with the Collins Family Trust.  (ER 65.)

In September 2002, before moving out of the Property, Chadwick refinanced the existing loan through an employee loan program available through Chadwick's then-employer, Merrill Lynch.  (Appellee Br. 14.)  At the time he applied for the new loan, Chadwick represented that he owned the Property and did not disclose the pending purchase agreement.  (*Id.*)  Chadwick also testified that, at the time he acquired the new financing, he believed that he had not transferred any interests in the property to Charles.  (*Id.* at 14–15.)  Both the existing financing (pre-September 2002) and new financing documents—both through Merrill Lynch—provided that Merrill Lynch could demand

---

[1] Citations to the Excerpt of Record refer to the "ER" pagination in the lower right hand corner of the document.  All other citations to docketed material refer to the CM/ECF page numbers stamped at the top of each page.

repayment of the loan in full if Chadwick transferred his interest in the Property without prior written approval from Merrill Lynch Credit Corporation, the lender. (*Id.* at 14.)

In December 2002, Chadwick and Janelle vacated the Property and Charles assumed control of the Property as of January 1, 2003. (ER 81–82.) The Collins "closed" the Purchase Agreement in December 2002, but did not execute a deed transferring title. From January 2003 until December 2016, when Charles turned over the Property to Appellee, Charles had received, paid, and claimed all income and expenses for the Property on his state and federal income taxes. (*Id.* at 85.) Chadwick and Janelle have paid no expenses, received no income, and have not claimed either expenses or income on their income taxes. (*Id.* at 74–76.) Charles leased out the Property and paid the monthly mortgage, property taxes, insurance, and homeowners' association ("HOA") fees. (Appellee Br. 15.) Chadwick testified that he changed the mailing address on the Merrill Lunch statements to Charles's office, but left his own name on the account. (Trustee's Excerpt of Record ("TER"), ECF No. 16-1, at 34–37.) Chadwick also retained his property insurance policy in his own name and had billing statements mailed to his new home. Property taxes and HOA statements remained in Chadwick and Janelle's names. (Appellee Br. 15.)

In 2008, Chadwick refinanced the loan and deed trust on the property with Merrill Lynch. (ER 43.) In the loan application, Chadwick represented that he and Janelle were the sole owners of the Property and there were no unrecorded encumbrances. (Appellee Br. 15.) Chadwick testified that he did not tell Merrill Lynch that Charles had any interest in the Property. (*Id.*) Charles did not sign the note or trust deed and did not make any representations to Merrill Lynch. The terms of the refinanced loan stated "[t]his loan is not assumable." (*Id.* at 16.) And, like the prior refinancing, Merrill Lynch could require full repayment of the loan if the Property was sold or transferred without Merrill Lynch's prior written consent. (*Id.*)

On October 26, 2011, Chadwick signed a quitclaim deed to Charles and the Collins Family Trust. (*Id.*) Janelle did not sign the quitclaim deed and the deed was never recorded. (*Id.*) On December 7, 2011, Chadwick filed bankruptcy pursuant to Chapter 7

of the Bankruptcy Code; Janelle did not join the petition and is not a co-debtor. The Property remained in Charles' possession and he continued to rent the Property out to tenants. Chadwick scheduled the Property as "held for another person," i.e., for Charles, on his bankruptcy schedule. On March 7, 2013, the Trustee-Appellee Nancy Wolf filed suit against Chadwick, Janelle, and Charles asserting claims for declaratory relief, sale of jointly held property under 11 U.S.C. § 363(h), and turnover of the Property. (ER 4–18.) Appellee's legal theory was that Charles acquired no right, title, or interest in the Property under the 2002 Purchase Agreement; that the Purchase Agreement had lapsed and was no longer in effect; the Property was the community property of Chadwick and Janelle; and that the Property belonged to the bankruptcy estate. (*See id.*) Thus, Charles had no right, title, or interest in the Property. Additionally, Appellee did not initially assert a claim for net rents against Charles for the rents he collected from tenants from when Chadwick filed his bankruptcy petition until the time Charles turned over the Property.

Appellants moved for summary judgment in 2014, asserting that Chadwick and Janelle held the Property in joint tenancy, rather than community property. Judge Peter Bowie found that Chadwick and Janelle held legal title to the property as joint tenants, i.e., as separate property and not community property. (ER 37–38.) Judge Bowie retired and the case transferred to Judge Laura Taylor's docket. Judge Taylor tried the case in two phases. At the conclusion of the first phase, Judge Taylor issued an oral ruling finding that Charles had no right, title, or interest in the property and that Chadwick and Janelle owned the property at the time Chadwick filed his bankruptcy petition. (TER 38–68.) Judge Taylor subsequently determined that Judge Bowie's previous community property holding was interlocutory and should be revisited in light of the California Supreme Court's decision in *In re Marriage of Valli*, 58 Cal. 4th 1396 (2014). Judge Taylor then ruled that Chadwick and Janelle owned the Property as community property and, therefore, the Property belonged entirely to the bankruptcy estate. (ER 104–12.)

Judge Taylor also determined that Appellee had a valid claim against Charles for turnover of post-petition rent, (*id.* at 114–18), and later ordered Charles to turn over the

property, (*id.* at 119–20). The Collins appealed the turnover order on December 27, 2016, but did not obtain a stay of the turnover order. (TER 73–75.) On September 19, 2017, Judge Roger T. Benitez granted Appellee's motion to dismiss the appeal for lack of jurisdiction. (*Id.* at 99–107.)

Judge Taylor tried the second phase and found that Appellee had a valid claim for post-petition net rent, (*Id.* at 142), and ordered Charles pay $44,313.41 in net rent to the bankruptcy estate, (*id.* at 148–60). In July 2017, Appellee moved to sell the Property under 11 U.S.C. § 363, which Judge Taylor approved, and the Collins did not obtain a stay of the sale order. (*Id.* at 90–93.) The Property was sold to a third party purchaser in August 2017. The sale proceeds were paid to several creditors and the remainder to Chadwick's bankruptcy estate. On October 4, 2017, Judge Taylor entered a final judgment against the Collins, (*id.* at 163–67), and this timely appeal followed the next day, (*id.* at 166–71).

## LEGAL STANDARD

Federal district courts have jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy courts. 28 U.S.C. § 158(a)(1). A district court reviews a bankruptcy court's legal conclusions *de novo* and its factual findings for clear error. *In re Mortgs. Ltd.*, 771 F.3d 1211, 1214 (9th Cir. 2014); *see Bronitsky v. Bea (In re Bea)*, 533 B.R. 283, 285 (9th Cir. BAP 2015). Mixed questions of law and fact are also reviewed de novo." *Diamond v. City of Taft*, 215 F.3d 1052, 1055 (9th Cir. 2000), *as amended on denial of reh'g* (July 26, 2000) (citing *United States v. City of Spokane,* 918 F.2d 84, 86 (9th Cir. 1990)). A district court will affirm a bankruptcy court's findings of fact unless those findings are "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 577 (1985)).

/ / /

/ / /

/ / /

## ANALYSIS

## I.  Mootness

Appellee contends that Appellants' appeal is moot because the bankruptcy court entered an order approving sale, (Appellee Br. 26 (citing TER 90–93)), and Appellants did not request or obtain a stay of the sale order, (*id.*).  Appellants contend that their appeal is not moot for two reasons: Appellee waived the mootness issue and Appellants do not seek to set aside the sale of the property or payments made to secured creditors.  (Reply 5.)

Generally, there are three mootness doctrines in bankruptcy cases—constitutional, equitable, and statutory—and only equitable and statutory mootness are at issue in this case.[2]  The Court will first address Appellants' waiver issue and then address the mootness issue on the merits.

### A. *Waiver of Mootness Issue*

As a threshold to the mootness issue, Appellants argue that Appellee waived her mootness argument because Appellee did not designate mootness as an issue on appeal, did not bring a motion, and did not cross appeal.  (Reply 5.)  Appellants contend Appellee is not entitled to raise this issue for the first time in her answering brief.  (*Id.*)

The appellant in a bankruptcy appeal has the burden to include a statement of issues. Fed. R. Bankr. P. 8009(a)(1)(A).  The appellee may designate additional issues.  Fed. R. Bankr. P. 8009(a)(2).  An appellant's opening brief must contain the statement of issues

---

[2] Constitutional mootness derives from Article III.  Federal courts are courts of limited jurisdiction and may only exercise jurisdiction in cases and controversies.  U.S. Const., art. III, § 2, cl. 1.  "The test for mootness of an appeal is whether the appellate court can give the appellant any effective relief in the event that it decides the matter on the merits in his favor.  If it can grant such relief, the matter is not moot."  *In re Thorpe Insulation Co.*, 677 F.3d 869, 880 (9th Cir. 2012) (quoting *Felster Publ'g v. Burrell (In re Burrell)*, 415 F.3d 994, 998 (9th Cir. 2005)).  "The party asserting mootness has a heavy burden to establish that there is no effective relief remaining for court to provide."  *In re Focus Media, Inc.*, 378 F.3d 916, 923 (9th Cir. 2004) (quotation marks omitted) (quoting *Pintlar Corp. v. Fid. & Cas. Co. (In re Pintlar Corp.)*, 124 F.3d 1310, 1312 (9th Cir. 1997)).

Here, if this Court were to reverse the bankruptcy court's sale order, then the bankruptcy court would be obligated to unwind the sale of the property and payment to secured creditors.  Thus, constitutional mootness is not at issue here.  *See id.*  Instead, statutory and equitable mootness are the most appropriate questions.

and arguments to support the issues. Fed. R. Bankr. P. 8014(a)(5), (7). The appellee's brief must conform to the same requirements as the appellant, but need not include a statement of the issues unless the appellee is dissatisfied with the appellant's statement. Fed. R. Bankr. P. 8014(b).

Here, Appellants' opening brief included at least two issues relevant to the mootness question: "Did the Bankruptcy Court err in determining that Plaintiff could sell, use or lease the Property pursuant to 11 U.S.C. § 363?" and "Did the Bankruptcy Court err in ordering Chadwick, Janelle, and Charles to immediately deliver to Plaintiff any and all possession, custody, or control of the Property?" (Appellant Br. 10.) These two issues directly implicate whether the bankruptcy court correctly issued the turnover order and the sale order. Appellants characterize mootness as a discrete issue, separate and apart from the turnover and sale orders. It is not clear to the Court how it could reverse the bankruptcy court on those issues without addressing whether those same issues are also moot. Instead, the Court finds that mootness is an argument bound up with Appellants' issues and will address mootness on the merits.[3] Further, as will be seen, the Court finds mootness only applies to the sale of the Property, which Appellants state they do not seek to set aside. (Reply 5.) Thus, Appellants are not unduly prejudiced by considering mootness.

### B. Statutory Mootness

Section 363(m) of the Bankruptcy Code governs statutory mootness and provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency

---

[3] The law is clear that an appellant who fails to raise an issue in its opening brief waives that issue on appeal. *Miller v. Fairchild Indus., Inc.*, 797 F.3d 727, 738 (9th Cir. 1986) (citing *Int'l Union of Bricklayers & Allied Craftsmen Local No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404 (9th Cir. 1985)). Appellants have not cited, and the Court has not found, any authority for the proposition that a bankruptcy appellee who includes an issue in its opening brief, but does not include an issue in its own statement of issue waives such an issue. While not conclusive, this militates toward addressing the mootness issue on the merits.

of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). "When a sale of assets is made to a good faith purchaser, it may not be modified or set aside unless the sale was stayed pending appeal." *In re Filtercorp, Inc.*, 163 F.3d 570, 576–77 (9th Cir. 1998) (citations omitted); *see* 11 U.S.C. § 363(m).

Appellee states that Appellants failed to seek a stay for each of the following order by the bankruptcy court: (1) the December 2016 order requiring Appellants to turnover the property to Appellee; (2) the August 2017 order approving sale of the property; and (3) the final judgment order, which included all prior rulings and a money judgment against Charles for post-petition rent. (Appellee Br. 26 (citing ER 119–20, 163–67; TER 90–93).) Appellants do not contest that they did not seek a stay at any stage.

Because Appellants did not obtain a stay, they cannot challenge the order of sale. The bankruptcy court's sale order included a finding that the estate purchases were made in good faith. (TER 90–93); *see In re Fitzgerald*, 428 B.R. 872, 880 (9th Cir. B.A.P. 2010) ("Unless and until 'good faith' has been determined, the appeal is not moot under section 363(m)." (citation omitted)). Therefore, statutory mootness applies to the bankruptcy court's order sale.

### C. Equitable Mootness

The Court reaches a similar conclusion with regard to the sale of the Property under the doctrine of equitable mootness. "[S]tatutory mootness codifies part, but not all of the doctrine of equitable mootness." *In re Castaic Partners II, LLC*, 823 F.3d 966, 968 (9th Cir. 2016) (citing *Clear Channel Outdoor Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 35 (9th Cir. B.A.P. 2008); 11 U.S.C. § 363(m); and *Onouli–Kona Land Co. v. Estate of Richards (In re Onouli–Kona Land Co.)*, 846 F.2d 1170, 1172 (9th Cir. 1988)). Equitable mootness applies when a court could reverse or modify a bankruptcy plan, but declines to effect such a remedy because "there has been a 'comprehensive change of circumstances . . . so as to render it inequitable for [the] court to consider the merits of the appeal.'" *In re Mortgs.*, 771 F.3d at 1214 (alteration in original) (quoting *Thorpe*, 677 F.3d

8

at 880). "An appeal is equitably moot if the case presents 'transactions that are so complex or difficult to unwind' that 'debtors, creditors, and third parties are entitled to rely on [the] bankruptcy court order." *Id.* at 1215 (alteration in original) (quoting *Thorpe*, 677 F.3d at 880).

The Ninth Circuit has articulated a four-part inquiry to determine whether equitable mootness should apply:

> We will look first at whether a stay was sought, for absent that a party has not fully pursued its rights. If a stay was sought and not gained, we then will look to whether substantial consummation of the plan has occurred. Next, we will look to the effect a remedy may have on third parties not before the court. Finally, we will look at whether the bankruptcy court can fashion effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation for the bankruptcy court.

*Thorpe*, 677 F.3d at 881. While *Thorpe* limited its analysis to plan consummation, the Ninth Circuit has held that the same principle applies to any equitable mootness analysis. *See In re Mortgs.*, 771 F.3d at 1271.

As previously discussed, Appellants did not seek a stay. Substantial consummation of the plan has occurred; the Property was sold and nearly fifty percent of the assets have been distributed to creditors. A remedy against the property or proceeds already distributed to creditors would create negative effects on their rights and interests. The bankruptcy court could not easily unwind the sale order and Appellants do not seek to unwind the sale. Thus, under both statutory and equitable mootness principles the property sale should not be undone.

Appellee next contends that equitable mootness should extend to Charles's defense against Appellee's claim for turnover of post-petition rent. (Appellee Br. 28.) Appellee does not explain her reasoning other than referencing that "those issues should also be considered equitably moot based on the same factors set forth above." (*Id.*) For their part, Appellants focus on the payment of fees from the sale proceeds to Appellee. (Reply 5.)

The bankruptcy court ordered payment of fees from the sale proceed funds to Appellee, Appellants objected, but the court overruled the objection, stating "[a]ll fee and costs allowed by this order may be subject to disgorgement." (*Id.* (quoting Bankr. Case No. 1-19790, ECF No. 140).) Appellants acknowledge, however, that the fee orders were not designated as an issue on appeal. (*Id.* at 5 n.1.) Appellants are silent on post-petition rent.

The Court discerns the following possible relief. First, Appellants argue the bankruptcy court improperly denied Charles compensation for the loss of exclusive possession of the property and his $93,000 down payment. (*Id.* at 5.) Second, they contend the court erred by ordering Charles to turnover post-petition net rents to the bankruptcy estate. (*Id.*) Third, though not designated on appeal, the bankruptcy court could order fees and costs be disgorged. The *Thorpe* factors do not support applying equitable mootness as to these avenues of relief. If the Court were to remand the case, the bankruptcy court could order payments made to Charles from the sale proceeds or excuse Charles from turning over rental proceeds (or order reimbursement of rent if turnover has already occurred). Those remedies could be awarded by the bankruptcy court without substantial disruption to third parties or creating an uncontrollable situation. It would simply mean less money in the bankruptcy estate and less money for creditors. Thus, considering the heavy burden to demonstrate mootness, the Court is satisfied that some potential relief remains available for Appellants and their appeal is not entirely moot. Accordingly, the Court will address the remainder of the appeal on the merits.

## II.    Transmutation

Appellants first argue that the bankruptcy court erred by determining the Property was community property. (Appellant Br. 16.) If the Property is community property, then Appellants' interest in the community property belongs to the bankruptcy estate. *See* 11 U.S.C. § 541(a)(2). Appellants' theory is that the Property was separate property, not community property, as evidenced by the fact that Chadwick and Janelle held record title to the Property as joint tenants. (Appellant Br. 20.) There are two California statutes that are relevant here. First, California Evidence Code § 662 provides that the "owner of legal

title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof." Second, California Family Code § 760 states, "[e]xcept as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property." The dispositive issue here is whether the bankruptcy court erred by determining that the community property presumption, i.e., section 760, applied over the form of title presumption, i.e., section 662.

### A. Whether **Valli** *Applies in Non-Dissolution Context*

In *In re Marriage of Valli*, the California Supreme Court examined whether property purchased with community property funds was separate or community property in a dissolution of marriage proceeding. 58 Cal. 4th at 1399. There, the husband used community property to purchase a life insurance policy, naming the wife as the sole owner and beneficiary. *Id.* The parties separated thereafter. At a marital dissolution proceeding, the trial court determined that the property was community property and not separate property, even though the husband arranged for the policy to be put solely in the wife's name. *See id.* at 1399–400. The Supreme Court first dealt with an argument that third party transactions at issue in divorce proceedings (i.e., a husband purchasing life insurance from a third party) were exempt from the transmutation statutes, which allow spouses to change the character of property from community to separate or vice versa. *Id.* at 1401; *see also* Cal. Fam. Code §§ 850–52. The Court reasoned that the California Legislature did not intend to "exempt from the transmutation requirements purchases made by one or both spouses from a third party during the marriage." *Valli*, 58 Cal. 4th at 1405. Thus, the Court held that third party transactions at issue in dissolution proceedings are not exempt from the transmutation statutes. *Id.*

The court of appeal had also relied on Evidence Code § 662's form of title presumption to overcome the transmutation requirements. The Supreme Court rejected that argument and held § 662's form of title presumption "does not apply when it conflicts with the transmutation statutes." *Id.* at 1406 (citing *In re Marriage of Barneson*, 69 Cal.

App. 4th 583, 593 (Ct. App. 1999)). Justice Chin wrote a concurring opinion, which explores more fully the relationship between § 662 and § 760. He stated, "section 662 has no place in the characterization of property in actions between spouses" and "applying section 662 to disputes between spouses 'would subvert basic tenets of California family law.'" *Id.* at 1409 (Chin, J., concurring) (citation omitted). "Thus, after *Valli*, there is no doubt that the community property presumption controls in marital dissolution or separation proceedings. What *Valli* did not address was the applicability of the community property presumption in other contexts." *In re Brace*, 566 B.R. 13, 19 (B.A.P. 9th Cir. 2017).

Appellants contend that *Valli* should not apply in the non-dissolution context and focuses on the difference between marital dissolution proceedings and other third party transactions that do not involve dissolution. They cite *In re Summers*, 332 F.3d 1240, 1242 (9th Cir. 2003), which held that "where title to California real property is held by spouses in joint tenancy, the form of title presumption prevails over the general presumption that property acquired during marriage is community property in the context of a bankruptcy case." (Appellant Br. 16.) Appellants acknowledge that *Valli* explicitly criticized a portion of *Summers*' holding, but contend that "*Valli* disapproved only the Ninth Circuit's conclusion in *Summers* that a spousal purchase from a third party could never be subject to the statutory transmutation requirements in a marital dissolution proceeding." (*Id.* at 18.)

Appellants argue that a marital dissolution proceeding is unique and that the form of title presumption is specifically disregarded in favor of the general community property presumption only during a dissolution. (*Id.* at 21 (citing Cal. Fam. Code § 2581).) Appellants cite several pre-*Valli* California opinions holding that the joint tenancy form of title is presumptively correct outside of the dissolution context. (*See id.* at 22 (citing, e.g., *Estate of Petersen*, 28 Cal. App. 4th 1742, 1747 (Ct. App. 1994)).) In sum, Appellants urge the Court to find error because *Valli* should be properly understood as applying only to dissolution proceedings and that in all other situations § 662's form of title presumption applies.

Appellee argues that *Valli* applies not only to suits between spouses but also to non-dissolution cases involving a spouse and third parties. (Appellee Br. 35.) Appellee reasons that neither *Valli* nor the California Legislature limited the application of Family Code § 852, which governs transmutation requirements, to suits between spouses. (*Id.*) Instead, *Valli* abrogated or criticized several opinions interpreting California law, including *Summers* and *In re Marriage of Brooks & Robinson*, 169 Cal. App. 4th 176, 190 (Ct. App. 2008), which had held that taking title in the name of only one spouse made the property presumptively separate property. (Appellee Br. 37.) Appellee contends that because Appellants did not follow the written declaration requirements to transmute the Property from community to separate property, then the community property presumption prevails. (*See id.* at 34–35.)

California Family Code § 760 generally presumes that all property acquired during marriage is community property. "[T]he general rule is that property acquired during marriage is community unless the preponderance of the evidence establishes that a specifically enumerated statutory exemption applies to make it something else." *Valli*, 58 Cal. 4th at 1407 (Chin, J., concurring). California Evidence Code § 662 is one possible statutory exemption and creates a presumption that "[t]he owner of legal title to property is presumed to be the owner of the full beneficial title." In situations like the one here, these presumptions are in direct conflict and one must yield to the other. *See id.* at 1408 ("Obviously, both presumptions cannot be given effect."). A further layer of complexity also exists; there is a second form of title presumption discussed in *In re Marriage of Lucas*, 27 Cal. 3d 808, 814 (1980). There, the Court discussed California Civil Code § 5110, which has since been replaced.[4] Section 5110 provided in part, "When a single-family residence of a husband and wife is acquired by them during marriage as joint tenants, for the purpose of the division of such property upon dissolution of marriage or legal

---

[4] Section 5110 was later split into two sections: Family Code § 760, which contains the general community property presumption, and Family Code § 2581, which contains the form of title presumption, discussed in *Lucas*, that applies only in dissolution proceedings. *See Valli*, 58 Cal. 4th at 1412.

17-CV-2066 JLS (BLM)

separation only, the presumption is that such single-family residence is the community property of the husband and wife."[5] *Lucas*, 27 Cal. 3d at 814 n.2. The form of title presumption applied when "the affirmative act of specifying a form of ownership in the conveyance of title that removes such [community] property from the more general presumption" of community property in section 5110. *Id.* at 814–15. "Thus, the form-of-title presumption the *Lucas* court discussed is a specific statutory presumption found within California's community property law, not the more general presumption found in section 662." *Valli*, 58 Cal. 4th at 1412 (Chin, J., concurring).

Appellants put forward § 662 as supplying the requisite statutory exemption to overcome the § 760 presumption. They cite *Summers* and *Brooks* for that proposition, (Appellant Br. 19.) *Summers* rested on two bases for its holding. First, the court determined community property presumption in Family Code § 760 is rebutted when a married couple acquires property from a third party as joint tenants. *See Summers*, 332 F.3d at 1242–44. Thus, "the community property presumption 'is overcome when a declaration in a deed or other title instrument indicates spouses take title to property as joint tenants.'" *Id.* at 1243 (quoting *Bernstein v. Pavich (In re Pavich)*, 191 B.R. 838, 844 (Bankr. E.D. Cal. 1996)). Second, the court reasoned that Family Code § 852(a), the transmutation statute, did not apply to purchases of property by a spouse from a third party because it did not involve an "interspousal transaction or agreement." *Id.* at 1244–45. The Court agrees with Appellants that *Valli* only expressly criticized *Summers*' second reason, i.e., "purport[ing] to exempt from the transmutation requirements purchases made by one or both spouses from a third party during the marriage." 58 Cal. 4th at 1405.

It does not follow, however, that the first basis for *Summers*' holding supports Appellants' position. *Summers* did not cite § 662 at any point in the opinion; in fact, it did

---

[5] That form of title presumption was moved to California Family Code § 2851, which currently states in relevant part: "For the purpose of division of property on dissolution of marriage or legal separation of the parties, property acquired by the parties during marriage in joint form, including property held in tenancy in common, joint tenancy, or tenancy by the entirety, or as community property, is presumed to be community property."

not cite any California statutory section as supplying the requisite exemption to overcome § 760. The cases on which *Summers* relied to overcome § 760 likewise do not cite § 662. *See, e.g.*, *Petersen*, 28 Cal. App. 4th at 1747. Instead, cases like *Petersen* ultimately relied on former Civil Code § 5110, which is currently located in Family Code §§ 760, 2851. *Summers* also relied on *In re Jacobs*, 48 B.R. 570, 573 (Bankr. S.D. Cal. 1985), which in turn cited *Lucas*. Yet, as Justice Chin points out in his concurring opinion, *Lucas* never cites § 662 and instead relies on former Civil Code § 5110 for the proposition that the form-of-title presumption applies to over the general community property presumption. *Valli*, 58 Cal. 4th at 1412 (Chin, J., concurring). Thus, *Summers* relies on § 5110, not § 662, and provides no support to Appellants.

*In re Marriage of Brooks & Robinson* presents a more interesting question. There, a wife had sold real property to a third party and the husband claimed an interest in the property and sought to set aside the sale. *Brooks*, 169 Cal. App. 4th at 180–82. The state appellate court in *Brooks* asked for supplemental briefing from the parties on the particular question of "whether the subject property is presumed to be the separate property of [the wife] because title is held in her name without reference to the marital relationship or to [the husband]" and cited Evidence Code § 662 as a basis for the supplemental briefing. *Id.* at 185. The *Brooks* court went on to discuss at length the general community property presumption and the form of title presumption as relied on by the *Lucas* court. *See id.* at 186–88. As previously discussed, *Lucas* did not cite or rely on § 662. Rather, the *Brooks* court determined that *Lucas*' form of title presumption, i.e., § 5110, survived various statutory amendments post-*Lucas*. The appellate court then pivoted to the other form of title presumption—§ 662—when discussing how the "form of title presumption affects the burden of proof." *Id.* at 189. To summarize, *Brooks* cited *Lucas* for the proposition that the former Civil Code § 5110 form of title presumption can remove property from the § 5110 general community property presumption. *See id.* at 186. *Brooks* then applied the Evidence Code § 662 form of title presumption, relying on *Lucas*, despite the fact that *Lucas* did not cite § 662.

The foregoing discussion illustrates the difficulty in discerning which presumption—§ 662 or § 760—controls non-dissolution cases in light of *Valli*. Part of the difficulty comes from the fact that there are essentially two form of title presumptions, § 662 and § 5110 (now Family Code § 2581). At bottom, Appellants ask this Court to do what no California court has done and hold that § 662 overcomes § 760 in a non-dissolution context. Because no California court has expressly done so, this Court declines to hold that § 662 overcomes the § 760 presumption. Other federal courts have reached similar conclusions. *See Brace*, 566 B.R. at 23; *see also Herrera v. Pons*, No. 17-cv-2392-GPC-NLS, 2018 WL 2229369, at *4 (S.D. Cal. May 16, 2018); *In re Obedian*, 546 B.R. 409 (Bankr. C.D. Cal. 2016).

### B. Whether the Property Granting Deed Was Valid Transmutation

Appellants' next contend even if the § 760 presumption applies, the grant deed conveying property to Chadwick and Janelle as "Husband and Wife as Joint Tenants" was a valid transmutation under Family Code § 852. (Appellant Br. 27.) Appellants cite *Estate of Bibb*, 87 Cal. App. 4th 461, 468–49 (Ct. App. 2001), for the proposition that the use of the term "grant" expressed a clear and unambiguous intent to transmute the Property from community to separate property. Appellants argue that the bankruptcy court erred by failing to find the grant deed to the Property met the § 852 requirements, as interpreted by *Bibb*, because the deed was in writing and both spouses signed the writing. (*Id.* at 28.)

Appellee responds that the grant deed was not signed by Chadwick and Janelle as the "adversely affected" spouses. (Appellee Br. 42.) Only the third party developer, Shea Homes, signed the deed. Appellee also contends that the grant deed does not "expressly state the character or ownership of the property is being changed," as required by *Estate of MacDonald*, 51 Cal. 3d 262 (1990), and *Valli*. (Appellee Br. 42.) Finally, Appellee cites the Collins' testimony, on which the bankruptcy court relied, that they did not intend to change the property from community to separate property. (*Id.*) In their reply brief, Appellants implicitly acknowledge that Chadwick and Janelle did not sign the grant deed, but contend that they accepted the deed by recording it. (Reply 10.)

California Family Code § 852 provides "[a] transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." Cal. Fam. Code § 852(a). The transmutation statute applies to property transactions purchased from third parties. *In re Marriage of Lafkas*, 237 Cal. App. 4th 921, 938 (Ct. App. 2015) (citing *Valli*, 58 Cal. 4th at 1405–06). "An 'express declaration' is a writing signed by the adversely affected spouse 'which expressly states that the characterization or ownership of the property is being changed.'" *Id.* (quoting *MacDonald*, 51 Cal. 3d at 272). "An 'express declaration' does not require use of the terms 'transmutation,' 'community property,' 'separate property,' or a particular locution." *In re Marriage of Starkman*, 129 Cal. App. 4th 659, 664 (Ct. App. 2005). "The express declaration must unambiguously indicate a change in character or ownership of property. A party does not 'slip into a transmutation by accident.'" *Id.* (citations omitted). "Courts have adhered closely to these requirements and declined to find a valid transmutation without a clear understanding in writing that the document changes the character or ownership of specific property." *In re Marriage of Bonvino*, 241 Cal. App. 4th 1411, 1429 (Ct. App. 2015) (citing *Starkman*, 129 Cal. App. 4th at 663–65).

Here, there was no express declaration that unambiguously indicated a change from community property to separate property. The bankruptcy court determined the Property was purchased with community property funds. Thus, under § 760 and § 852, the Property was community property unless the spouses agreed to transmute the Property to separate property. In *Bibb*, the husband signed a grant deed conveying his separate property to himself and his wife using language similar to the grant deed at issue here. *Compare* 87 Cal. App. 4th at 468 n.3 ("For a valuable consideration, receipt of which is hereby acknowledged, E.L. Bibb, as surviving joint tenant hereby grant(s) . . . ."), *with* ECF No. 13-1, at 23 ("For a valuable consideration, receipt of which is hereby acknowledged, Shea Homes Limited Partnership, a California limited partnership hereby grant(s) . . . ."). The obvious distinguishing fact is that in *Bibb*, the party conveying the grant deed was the

husband; here, the developer, not the spouses, conveyed the grant deed. Simply because there was a transfer of the Property does not mean that transfer effectuated a transmutation. *See In re Cecconi*, 366 B.R. 83, 130–31 (Bankr. N.D. Cal. 2007) (finding no transmutation where there was no statement or indication that a wife was aware of the legal effect of her signature to alter the character of her interest in property), *aff'd sub nom. Spicer v. Cecconi*, 413 Fed. App'x 976 (9th Cir. 2011). The grant deed here demonstrated Shea Homes' intent to convey the property and the Collins' intent to receive it. Or, at least, there is ambiguity as to the intent to transmute the Property, whereas *Bibb* involved a "clear shift in the nature of the husband's property interest." *Id.* at 131. Accordingly, the bankruptcy court did not clearly err in finding no valid transmutation from community to separate property.

## III.    Charles's Equitable Interest in the Property

Appellants next contend that Charles owned all equitable interest in the Property as a result of his and Chadwick and Janelle's performance under the 2002 purchase agreement. (Appellant Br. 30.) Where a bankruptcy debtor does not hold an equitable interest in property, that property is not included in the bankruptcy estate. 11 U.S.C. § 541(d). Thus, if Charles held an equitable interest, the Property would not belong to the estate. Appellants contend the bankruptcy court erred by determining Charles had no interest in the property and advance three arguments in support of that thesis.

### A.  *Equitable Conversion*

Appellants first contend that Charles had an equitable interest in the Property since January 1, 2003, because he performed all of his obligations under the 2002 purchase agreement. (Appellant Br. 32.) Appellants cite the doctrine of equitable conversion as providing the requisite theory to specifically enforce the transaction parties' interests. (*Id.* at 31.)

"An unconditional contract for the sale of land, of which specific performance would be decreed, grants the purchaser equitable title, and equity considers him the owner." *Parr-Richmond Indus. Corp. v. Boyd*, 43 Cal. 2d 157, 165 (1954), *overruled on other grounds by Williams & Fickett v. Cnty. of Fresno*, 2 Cal. 5th 1258 (2017). "Regardless of the

foregoing rule, equitable conversion 'may or may not be absolute. Whether it is, or not, will depend upon whether the terms of the contract of sale are subsequently complied with.'" *Ocean Ave. LLC v. Cnty. of Los Angeles*, 227 Cal. App. 4th 344, 352 (Ct. App. 2014) (quoting *In re Estate of Dwyer*, 159 Cal. 664, 675 (1911), *as modified on denial of reh'g* (June 24, 2014)). "Further, the doctrine will not be invoked when it would compel an inequitable result . . . ." *Id.* (quotation mark omitted) (quoting 13 Witkin, *Summary of Cal. Law, Equity*, § 174 (10th ed. 2005)).

Appellants contend that Charles performed all of his obligations under the performance agreement, including paying the $93,000 down payment, paying all obligations associated with the property, assuming the remaining mortgage obligation, collecting rents, and acting in all ways as the owner. (Appellant Br. 32–33.) Charles paid all subsequent mortgage payments, paid all HOA fees, insurance fees, property taxes, and other expenses. (*Id.* at 33.) Appellants compare the facts here with *Rogers v. Davis*, 28 Cal. App. 4th 1215 (Ct. App. 1994). There, the parties entered into an oral agreement for the sale of property and the buyers agreed to pay a portion of the total purchase price and to assume the existing deed note. *Id.* at 1219. The buyers occupied the property, made payments on the deed, improved the property, and, at the sellers' request, began making payments on a second trust deed that encumbered the property. *Id.* Over eight years later, the parties finally agreed to complete the sale, but the sellers refused to sign the escrow documents and the buyers filed suit. *Id.* at 1220. On appeal, the court determined that the doctrine of equitable conversion applied and that the buyers were equitable owners. *See id.* at 1222–23. Appellants urge a similar result here. (Appellant Br. 32; Reply 12.)

Appellee maintains that the doctrine of equitable conversion is a form of specific performance, which requires a breach by one party of the contract. (Appellee Br. 42.) Appellee then contends that the bankruptcy court reviewed the extrinsic evidence to determine that Chadwick and Janelle did not breach the 2002 purchase agreement. (*Id.* at 43.) For example, Chadwick testified that he and Janelle did not transfer the Property to Charles because Charles wanted to keep Chadwick's favorable Merrill Lynch loan. (*Id.*)

In 2008, in order to secure a new favorable loan, Chadwick represented to Merrill Lynch that he and Janelle owned the property. (*Id.*) Charles knowingly accepted the benefits of Chadwick's performance by taking advantage of the lower interest rate available only by Chadwick representing to Merrill Lynch that he and Janelle owned the Property. (*Id.*) Appellee contends that the bankruptcy court did not err in finding that the parties waived the transfer provision.

Appellants respond that the bankruptcy court's ruling that the parties waived the right to title or modified a term simply meant that the sellers (Chadwick and Janelle) retained a legal interest in the Property, but did not divest Charles of his equitable interest in the Property. (Reply 12.)

It is clear that specific performance is a remedy for a breach of contract. *See Rogers*, 28 Cal. App. 4th at 1220. As the *Rogers* court stated, "[i]t is apparent that plaintiffs' insistence on proving their right to specific performance was premised on the principle that '[a]n unconditional contract for the sale of land, of which specific performance would be decreed, grants the purchaser equitable title, and equity considers him the owner.'" *Id.* at 1222 (citations omitted). Thus, without a breach of the 2002 purchase agreement, there is no specific performance and no equitable conversion.

The bankruptcy court determined that title was never transferred to Charles, as was required by the agreement, and the parties mutually agreed to abandon or waive that term. (ECF No. 13-2, at 129.) The court went on to hold that the Collins either never intended to comply with the title transfer term or at some later date mutually agreed not to comply with that term. (*Id.* at 130.) The court based its findings on several factors: (1) the failure to record a deed after the purchase agreement closed; (2) Janelle's failure to execute the deed dated in 2011, by which Chadwick and Charles tried to change ownership; and (3) representations Chadwick made to his employer-lender when he obtained favorable financing for the Property. (*Id.*) Every time Chadwick financed or refinanced the Property, he represented that he, not Charles, owned both the legal and beneficial interest in the Property. (*Id.*) According to the court, the motive to abandon the transfer of title term was

clear: the Collins could only obtain a favorable loan from Chadwick's employer, Merrill Lynch, if Chadwick and Janelle, but not Charles, had 100% ownership interest in the Property. (*Id.*)

The interpretation of a contract is a mixed question of law and fact. An appellate court reviews de novo interpretation of contract language. *See Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 367 (9th Cir. 1985). "When the inquiry focuses on extrinsic evidence of related facts, however, the trial court's conclusions will not be reversed unless they are clearly erroneous." *Id.* (citations omitted). The bankruptcy court determined there was no breach of the 2002 purchase agreement because the unfulfilled term—transfer of title—was either waived or abandoned. (ECF No. 13-1, at 1238 (bankruptcy court's April 8, 2012 oral order).) This is a conclusion based on extrinsic facts and is reviewed for clear error.

The facts support the bankruptcy court's holding; the Collins failed to transfer title and had a clear financial benefit for maintaining title in Chadwick and Janelle's names. The bankruptcy court found that when Chadwick applied for a financing loan from his employer, he represented that there was no transfer of the Property and that he would notify the lender if the Property were transferred. (*Id.* at 1228–30.) Chadwick and Janelle insured the Property and named themselves as the insureds. (*Id.* at 1230.) Further, when the Property suffered water damage in a later year, the invoice to the insurer was submitted in Chadwick's name. (*Id.* at 1230–31.) The monthly HOA statements were mailed to Charles' office, but named Chadwick and Janelle as the owners. (*Id.* at 1231.) The court also determined that Charles knew that a quitclaim deed would be required to close the 2002 purchase agreement, but Charles never asked for a deed to be executed. (*Id.*) The court did not find credible Charles' statement that he "forgot" to take title in his name. (*Id.* at 1238–39.)

Appellants focus mostly on what Charles did—he made a down payment, paid the mortgage, and otherwise fulfilled his obligations. While there is evidence to support the finding that Charles fulfilled his terms, the appropriate focus is on the unfulfilled term—

whether Chadwick and Janelle transferred title. The court determined that Chadwick and Janelle did not breach the unfulfilled term because Charles consented to the failure to transfer title. (*Id.* at 1241.) Moreover, the court found that Chadwick testified that he and Janelle fully performed the 2002 purchase agreement when they departed the Property. (*Id.* at 1231.) The court also found Charles testified that "the purchase agreement would close when he paid the down payment and got possession of the property. There were no other requirements for closing." (*Id.* at 1234.)

The facts here are clearly distinguishable from those in *Rogers*; there, the seller refused to sign the escrow documents and therefore breached the contract. Here, Chadwick did not refuse to carry out the transfer; instead, the parties either waived or abandoned that term and the factual findings support that conclusion. Without breach, there can be no equitable conversion. Therefore, the bankruptcy court did not err in holding that there was no equitable conversion.

### B. Oral Modification

Appellants also argue that the bankruptcy court erred by finding that the 2002 purchase agreement had been modified because there are limited circumstances, not met here, in which a written contract may be orally modified. (Appellant Br. 34.) Appellants contend that because the purchase agreement was not modified, then the parties were obligated to perform according to the original terms of the agreement. (*Id.* at 35.) Thus, the failure to perform meant that there was a breach of the purchase agreement entitling Charles to damages. (*Id.*) Appellee does not address the oral modification argument.

Appellants are correct that a contract in writing may be modified by an oral agreement "to the extent that the oral agreement is executed by the parties." Cal. Civ. Code § 1698. However, the bankruptcy court did not determine there was an oral modification of the contract; it determined that the parties either mutually abandoned the term, (ECF No. 13-1, at 1241), or waived the term, (*id.* at 1242 (citing *Gould v. Corinthian Colls., Inc.*, 192 Cal. App. 4th 1176 (Ct. App. 2011)).

"In California, as in many other states, if a non-breaching party accepts continued

performance by a breaching party, it waives the breach." *Shahani v. United Commercial Bank*, 457 B.R. 775, 789 (N.D. Cal. 2011) (citing *Leiter v. Eltinge*, 246 Cal. App. 2d 306, 317–18 (Ct. App. 1966)); *see also Whitney Inv. Co. v. Westview Dev. Co.*, 273 Cal. App. 2d 594, 603 (Ct. App. 1969) ("When the injured party with knowledge of the breach continues to accept performance from the guilty party, such conduct may constitute a waiver of the breach."). Waiver is a question of fact for the trial court. *Black v. Arnold Best Co.*, 124 Cal. App. 2d 378, 384–85 (Ct. App. 1954). Here, Charles had knowledge that Chadwick had not performed by transferring the deed to the Property to Charles and yet he took no action. Appellants did not provide the bankruptcy court, nor have they cited on appeal, any proof that Charles demanded title be transferred. The bankruptcy court therefore did not err in finding waiver.

"An abandonment of a contract may be implied from the acts of the parties and this may be accomplished by the repudiation of the contract by one of the parties and by the acquiescence of the other party in such repudiation." *Lubin v. Lubin*, 144 Cal. App. 2d 781, 796 (Ct. App. 1956) (quoting *Dessert Seed Co. v. Garbus*, 66 Cal. App. 2d 838, 847 (Ct. App. 1944)). Rescission may be proved by words and acts, but must be mutual. *See id.* (citing Cal. Civ. Code § 1689). "Section 1698 of the Civil Code, however, has no application to the abandonment by mutual consent of an agreement in writing." *Honda v. Reed*, 156 Cal. App. 2d 536, 539–40 (Ct. App. 1958). "Abandonment is not an 'alteration' or modification of a contract. Abandonment of a contract terminates it and entirely abrogates so much of it as is unperformed." *Id.* (citation omitted).

The bankruptcy court found that Chadwick repudiated the contract term requiring him and Janelle to transfer the deed to Charles. The bankruptcy court also determined that Charles did not demand title be transferred—rather, he acquiesced to Chadwick's inaction. Thus, the bankruptcy court did not err in determining the parties abandoned the contract.[6]

---

[6] It appears the bankruptcy court found that the parties only abandoned one term and the remainder of the contract remained in place. The Court has not found any cases permitting abandonment of a specific term while allowing the remainder of the contract to stand. This is of no moment because if the parties had

The bankruptcy court did not err in finding both waiver and abandonment.

### C. Equitable Interest as Purchaser Under Land Sales Contract

Appellants contend that Charles held equitable interest in the Property as a buyer under a land sales contract. (Appellant Br. 35.) "Under California law, a purchaser of real property under a land sales contract is considered an equitable owner of the property." (*Id.* (quoting *In re Hathaway Ranch P'ship*, 127 B.R. 859, 863 (Bankr. C.D. Cal. 1990)).) Appellants maintain that Charles meets the land sale contract requirements because he paid the $93,000 down payment and met his ongoing obligations to maintain total financial responsibility for the Property; thus, he had an equitable interest as a land sale purchaser. (*Id.* at 36.)

Appellee argues that the 2002 purchase agreement failed to set forth in the contract any "specified conditions," as required by California statute to qualify as a land sale contract. (Appellee Br. 44 (quoting Cal. Civ. Code § 2985).) Appellee also contends that the 2002 purchase agreement fails § 2985.5's requirement that any land sale contract specify the number of years required to complete payments. (*Id.*)

"In California, an installment land sale contract provides that the buyer makes periodic 'installment' payments while the seller retains legal title until conditions are met." *In re Berg*, No. AP 13-90174-CL, 2015 WL 3792654, at *5 (Bankr. S.D. Cal. June 9, 2015) (citing 1 Harry D. Miller, *Miller & Starr's California Real Estate*, § 2:11 (3d ed.); *Tucker v. Lassen Sav. & Loan Ass'n*, 12 Cal. 3d 629, 637 (1974); and Cal. Civ. Code § 2985). California Civil Code § 2985.5 requires that "[e]very real property sales contract entered into after January 1, 1966, shall contain a statement of: (a) The number of years required to complete payment in accordance with the terms of the contract. (b) The basis upon which the tax estimate is made."

Here, the 2002 purchase agreement contained no description of the number of years

---

abandoned the entire contract, then any remaining performance would have been abrogated. No further performance would have remained.

required to complete payment and no basis upon which the tax estimate was made. (*See* ECF No. 13-1, at 26.) Accordingly, the purchase agreement did not meet the requirements for a land sale contract, *see* Cal. Civ. Code § 2985.5, and Charles had no equitable interest in the Property on that basis.

## IV. Executory Contract

Appellants maintain that the 2002 purchase agreement could qualify as an executory contract because both parties to the agreement had outstanding performance at the time of the date of petition for relief. (Appellant Br. 36–37.) Charles was not a named borrower on any note secured by the Property and record title was not transferred from Chadwick and Janelle to Charles. (*Id.* at 37.) Appellants contend that if the purchase agreement required formal assumption of the secured note by Charles and transfer of record title by Chadwick and Janelle to Charles, then both sides had substantial outstanding performance obligations such that the contract was an executory agreement subject to 11 U.S.C. § 365. (*Id.*) Appellants also argue that even if the bankruptcy court correctly determined that the contracting parties deleted the title transfer term, then Chadwick and Janelle were still required to relinquish all other interests, which had yet to be performed. (*Id.* at 37–38.) Finally, Appellants contend that because Appellee did not assume the executory contract under 11 U.S.C. § 365(d), then Charles was entitled to remain in possession of the property and have Appellee turn title over to him under § 365(i). (*Id.* at 38.)

Appellee argues that the 2002 purchase agreement was not executory because Chadwick and Janelle did not have unperformed obligations that would amount to material breach if they failed to perform. (Appellee Br. 45.) The bankruptcy court determined that Charles waived the requirement for a transfer of title in order to take advantage of Chadwick's favorable Merrill Lynch loan. (*Id.*) According to Appellee, only Charles had unperformed obligations—assumption of the existing loan—and the agreement was not executory on both sides. (*Id.*) Further, Chadwick omitted the purchase agreement from his Bankruptcy Schedule G, which required disclosure of executory contracts, thus impliedly admitting the purchase agreement was not executory. (*Id.*)

"Though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides." *In re Aslan*, 909 F.2d 367, 371 (9th Cir. 1990) (quoting *In re Alexander*, 670 F.2d 885, 887 (9th Cir. 1982)). Whether a contract is executory "turns on the particular rights and duties of each contracting party" and on "[t]he existence of substantial and unperformed obligations on both sides." *In re Quintex Entm't, Inc.*, 950 F.2d 1492, 1496 (9th Cir. 1991) (citing *Alexander*, 670 F.2d at 887; and *In re Select-A-Seat Corp.*, 625 F.2d 290, 292 (9th Cir. 1980)).

Here, the bankruptcy court determined that Charles waived the title transfer provision or the parties mutually abandoned the term. While Charles had remaining obligations, i.e., to assume the existing loan, there was no corresponding outstanding obligation on the part of Chadwick and Janelle. Appellants contend that Chadwick and Janelle had not relinquished the right exclusively to possess and control the Property. (Appellant Br. 37–38.) This position stands in direct contrast to Appellants' factual assertions, in which they state, "[e]ffective January 1, 2003, Charles obtained exclusive possession of the Property, assumed full financial responsibility for and control over it, including the September 2002 secured note, and began renting it to a tenant." (*Id.* at 13 (citing ER 43, 81–85).) In support of a 2014 motion for summary judgment before Judge Bowie, Janelle declared, "[i]n 2002, my father-in-law renovated, assumed full financial responsibility for and control over Beechtree, and began renting out the home." (ECF No. 13-1, at 44.) She went on to state, "[m]y father-in-law has had exclusive control over Beechtree from his 2002 purchase through the present date." (*Id.*) Similarly, Chadwick declared:

> Since purchasing Beechtree from us in August 2002, my father has paid each and every expense for the home (all loan payments, taxes, insurance, repairs, upkeep, etc.). He has made all decisions regarding it and received all net rental income. Janelle and I have had nothing to do with Beechtree since its sale in 2002 to my father, other than applying for and receiving a refinance on a mortgage always paid by my father. My father has had

17-CV-2066 JLS (BLM)

exclusive control over Beechtree from his 2002 purchase through
the present date.

(*Id.* at 47; *see also id.* at 901 (Chadwick's trial testimony stating, "I believed that we had transferred ownership to my father.").) Charles likewise made similar representations. (*Id.* at 50–51.)

There is sufficient factual evidence in the record for the bankruptcy court to determine that Chadwick and Janelle had performed their outstanding obligations under the 2002 purchase agreement. The parties waived or abandoned the transfer of title provision and the parties believed that Charles had possession and control of the Property. No outstanding obligation remained for Chadwick and Janelle. Therefore, the bankruptcy court did not err in finding the purchase agreement was not an executory contract.

## V. Quitclaim Deed

Next, Appellants contend that Chadwick signed a 2011 quitclaim deed and intended to transfer title to Charles when he signed the deed. (Appellant Br. 39.) Though the deed was unrecorded, Appellants argue that quitclaim deed was effective to transfer Chadwick's fifty percent joint tenancy interest in the Property to Charles. (*Id.*)

Appellee maintains that the bankruptcy court correctly determined that the quitclaim deed was ineffective because Janelle did not sign it. Under California law, a deed to community property in both spouses' names must be signed by both spouses. (Appellee Br. 45–46 (citing Cal. Fam. Code § 1102(a)).) Appellee also points out that Chadwick believed when he executed the deed that it would not transfer the interest in the Property until Janelle signed it. (*Id.* at 46.)

California Family Code § 1102(a) provides that "both spouses . . . must join in executing any instrument by which . . . community real property or any interest therein . . . is sold, conveyed, or encumbered." *See Droeger v. Friedman, Sloan & Ross*, 54 Cal. 3d 26, 38 (1991), *superseded on other grounds by* Cal. Fam. Code § 2033. Here, Janelle did not sign the quitclaim deed and Chadwick could not convey his interest in the community property without her consent. Moreover, at trial, Chadwick expressed his belief that Janelle

had to sign the quitclaim deed in order for it to effectively transfer any interest. (ECF No. 13-1, at 898.) Thus, the bankruptcy court did not err in determining Charles did not acquire an interest in the Property after Chadwick signed the 2011 quitclaim deed.

## VI. Adverse Possession

Appellants' argue Charles held beneficial interest by adverse possession.

> In an action to quiet title based on adverse possession the burden is upon the claimant to prove every necessary element: (1) Possession must be by actual occupation under such circumstances as to constitute reasonable notice to the owner. (2) It must be hostile to the owner's title. (3) The holder must claim the property as his own under either color of title or claim of right. (4) Possession must be continuous and uninterrupted for five years. (5) The holder must pay all the taxes levied and assessed upon the property during the period.

*Vieira Enters., Inc. v. McCoy*, 8 Cal. App. 5th 1057, 1075 (Ct. App. 2017) (quoting *Dimmick v. Dimmick*, 58 Cal. 2d 417, 421 (1962)), *as modified on denial of reh'g* (Feb. 22, 2017). "A person claiming title to property by adverse possession must establish his claim under either section 322 [color of title] or under sections 324 and 325 [claim of right] of the Code of Civil Procedure." *Sorensen v. Costa*, 32 Cal. 2d 453, 458 (1948).

Appellants maintain that Charles meets the requirements for adverse possession under color of title. (Appellant Br. 40.) They assert that Charles' claim of title was based on the 2002 purchase agreement and the purchase agreement constitutes the written instrument purporting to convey title. (*Id.*) Appellants next contend that Charles' possession was adverse because he believed, acted, and intended to hold and use the Property as his exclusive right. (*Id.* at 42.) Charles exercised sole dominion and control over the property. (*Id.*) The parties generally agree that Charles occupied the Property since 2002, rented the property starting January 1, 2003, used the home for at least five years, and paid property taxes during at least five years. (*Id.* at 41.)

Appellee first argues that the purchase agreement fails to meet the requirements for color of title because it does not have the essentials of an effective monument of title, but

is defective in some respect. (Appellee Br. 47 (citing *Sorenson*, 32 Cal. 2d at 458).) Appellee points out that Charles agreed that Chadwick and Janelle held title during the time Charles possessed the Property. (*Id.*) Appellee next contends that Charles' possession could not be hostile and adverse because he had the permission and consent of the owner. (*Id.* (citing *Becket v. City of Petuluma*, 171 Cal. 309, 314 (1915)).)

"Adverse possession under color of title is based on a written instrument, judgment, or decree which purports to convey real property but is for some reason defective." *Aguayo v. Amaro*, 213 Cal. App. 4th 1102, 1110–11 (Ct. App. 2013) (citing *Estate of Williams*, 73 Cal. App. 3d 141, 147 (Ct. App. 1977)); and *Safwenberg v. Marquez*, 50 Cal. App. 3d 301, 309 (Ct. App. 1975)). "The good faith of the occupant, in relying on a defective instrument, is a crucial element to establishing adverse possession based upon color of title." *Williams*, 73 Cal. App. 3d at 147.

Here, the purchase agreement does not constitute color of title. Charles did not have a good faith belief that he had legal title to the property; in fact, he believed that Chadwick maintained legal title. The parties knew transfer of title was required; the bankruptcy court found that Charles was a sophisticated real estate business person. (ECF No. 13-1, at 1233–34.) Despite this sophistication, no transfer of title occurred and the bankruptcy court made a factual finding that the parties believed the purchase agreement closed when Charles paid the down payment and received possession of the Property. (*Id.* at 1234.) The bankruptcy court's factual findings were not erroneous and support a finding of no color of title. Without color of title, Charles could only establish adverse possession through claim of right. However, a claim of right fails because Charles cannot demonstrate his possession was hostile to Chadwick and Janelle. The court in *Vieira Enterprises* describes the hostility requirement as "not that the parties must have a dispute as to the title during the period of possession, but that the claimant's possession must be adverse to the record owner, 'unaccompanied by any recognition, express or inferable from the circumstances of the right in the latter." 8 Cal. App. 5th at 1077 (quoting *Sorenson*, 32 Cal. 2d at 459).

The bankruptcy court determined that the Collins recognized that Chadwick and

Janelle, as the record owners, had title and Charles did not. The evidence supports that finding. For example, Chadwick testified that he did not inform Merrill Lynch of any interest his father had in the Property and Chadwick further testified that he believed that he owned the Property after he signed the purchase agreement. (ECF No. 13-1, at 848.) The reason for the omission on the loan application is obvious: the Collins needed to maintain Chadwick's role as record owner in order to secure a favorable mortgage rate from Merrill Lynch. (*See id.* at 50 (Charles' declaration stating, "[b]y leaving title in Chadwick's and Janelle's names, in 2009, Chadwick and Janelle were able, solely for my benefit, to refinance the mortgage on Beechtree at a lower, more favorable interest rate.").) Because he cannot establish hostility, Charles' adverse possession claim must fail.

## VII. Damages Under California Civil Code § 3306

Appellants contend that if Charles was not the legal or equitable owner of the Property, then he was entitled to damages under California Civil Code § 3306. (Appellant Br. 43.) Charles paid $93,000 in down payment, as well as all mortgage and property tax obligations since January 1, 2003. (*Id.*) Appellants contend that because the bankruptcy court required Charles to relinquish the Property to Appellee, Charles was entitled to damages arising from the sellers' failure to transfer the rights to which the parties agreed. (*Id.*)

A necessary element of California Civil Code § 3306 and Appellants' theory is "the breach of an agreement." Cal. Civ. Code § 3306. The bankruptcy court determined there was no breach of contract. Instead, as previously discussed, the parties waived or abandoned the obligation for Chadwick to transfer title to Charles. *See supra* section III.A. The same reasoning applies with equal weight here; because Chadwick did not breach the contract, Charles is not owed damages under § 3306.

## VIII. Statutory Lien

Next, Appellants assert that Charles, as buyer under the purchase agreement, was entitled to a lien secured by the Property on his $93,000 down payment. (Appellant Br. 45.) California Civil Code § 3050 provides that a purchaser "who pays to the owner any

part of the price of real property under an agreement for the sale thereof, has a special lien upon the property, independent of possession, for such part of the amount paid as he may be entitled to recover back, in case of a failure of consideration." Appellants contend that Charles met his obligations under the purchase agreement and his damages should be secured by a lien on the sale of the proceeds of the Property. (*Id.* at 46.)

Appellee argues that there was no failure of the sale for any reason that was not the fault of the purchaser. (Appellee Br. 47.) Instead, Chadwick and Janelle did not transfer an interest in the Property to Charles because Charles agreed that Chadwick and Janelle should retain the Property to take advantage of the favorable loan interest rate. (*Id.*)

"Where a vendee is not in default, but the vendor refuses or neglects to convey, being under duty to do so, 'his default authorizes the vendee to treat the contract as at an end, and to recover the money which has been paid.'" *Moresco v. Foppiano*, 7 Cal. 2d 242, 247 (1936) (quoting *Chatfield v. McDaniel*, 85 Cal. 518, 521 (1895); and citing *Glock v. Howard & Wilson Colony Co.*, 123 Cal. 1, 10 (1898)). "The vendee is entitled to a foreclosure of the lien afforded by section 3050 of the Civil Code." *Id.* (citing *Lockie v. Coop. Land Co.*, 207 Cal. 624, 628 (1929)). Here, as previously discussed, the bankruptcy court did not err by determining there was no breach of contract. *See supra* section III.A. Janelle and Chadwick were not in default. Without a default, there can be no statutory lien.

## IX. Post-Petition Rent Damages

Finally, Appellants contend that Appellee did not assert a claim for turnover of post-petition net rents in the adversary complaint. (Appellant Br. 46.) They argue that Appellee cannot recover on a claim not included in the complaint. (*Id.*) Alternatively, Appellants assert that the bankruptcy court should not have calculated net rent damages from the petition date because Judge Bowie's decision—that Chadwick and Janelle held the Property as joint tenants—was not overturned until August 29, 2016, and Judge Taylor's decision was not retroactive. (*Id.* at 47.) Because Charles possessed the Property with the express permission of Janelle, a joint tenant, Charles was entitled to retain the net rents during the term of his lawful possession. (*Id.*) Along the same lines, Charles' possession

was not terminated until the bankruptcy court's December 13, 2016 order and, because Charles had the express permission of Janelle, he could retain net rents. (*Id.* at 47–48.)

Appellee responds that Appellants disregard the bankruptcy court's finding that the Trustee included in her initial discovery disclosures, filed shortly after the complaint, that damages sought included "the value of net rental income for the subject property from December 7, 2011." (Appellee Br. 48 (quoting CER 114–18).)

The bankruptcy court determined that the plain language of 11 U.S.C. § 542(a) required the turnover of rents to the Trustee. *See In re Collins*, No. 11-19790-LT7, 2017 WL 2964800, at *4–5 (Bankr. S.D. Cal. July 10, 2017). The court then rejected Appellants' argument that Janelle gave permission to Charles to collect rent because the court had previously determined that the Property was community property and thus belonged to the bankruptcy estate. *Id.* at *5. The court then determined that the entirety of rents belonged to the bankruptcy estate and, once Chadwick filed bankruptcy, the Bankruptcy Code required turnover of all rents. *Id.*

Section 542(a) "allows a turnover motion to be brought against the entity at any time during the pendency of the bankruptcy case, even if the entity no longer possesses or has custody or control over the property, at the time the motion is filed." *Shapiro v. Henson*, 739 F.3d 1198, 1200 (9th Cir. 2014). Thus, the Ninth Circuit has held that "a trustee may seek turnover from an entity that had 'possession, custody, or control' of the subject property during the bankruptcy case whether or not the entity had 'possession, custody, or control' at the time the turnover motion is filed." *Id.* at 1204. Together, the plain language of § 542(a) and *Shapiro* dictate that Appellee did not need to assert a turnover claim in the adversary complaint in order to seek turnover. The motion could be filed at any time.

Further, the plain language of the statute makes clear that the proper turnover date was the date of the filing of the petition. Section 542(a) states, "an entity, other than a custodian, in possession, custody, or control, *during the case*, of property that the trustee may use, sell, or lease under section 363 . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential

value or benefit to the estate." 11 U.S.C. § 542(a) (emphasis added). Once Chadwick filed his petition, the Property became the property of the estate. *See* 11 U.S.C. § 541(a). Charles owed all rents belonging to the Property for the duration of the case, i.e., when the petition was filed.

Finally, Charles had express permission from Janelle to possess the Property. (ER 127, 132.) Once appointed, a trustee assumes all assets and claims belonging to the debtor and the trustee is the proper party in interest. *See Moneymaker v. CoBen (In re Eisen)*, 31 F.3d 1447, 1451 n.2 (9th Cir. 1994) (citation omitted). According to Appellants' theory, the Trustee was a co-tenant with Janelle and all cotenants have an equal right to possession of the whole property. *Dabney v. Dabney*, 104 Cal. App. 4th 379, 382 (Ct. App. 2002) (citing 4 Witkin, *Summary of Cal. Law, Real Property*, § 264 (9th ed. 1987)). This theory assumes that Janelle and Chadwick held the Property as joint tenants as separate property and Janelle could give her permission to Charles without Chadwick. Yet, the bankruptcy court correctly determined the Property was held as community property. As the bankruptcy court points out, California Family Code § 1102 requires both spouses to participate in a transfer of an interest in real property. Moreover, under the Bankruptcy Code, the community property of the debtor and debtor's spouse belongs to the bankruptcy estate. 11 U.S.C. § 541(a)(2); *see Teel v. Teel (In re Teel)*, 34 B.R. 762, 764 (9th Cir. B.A.P. 1983). Thus, Janelle could not, by herself, give Charles permission to possess the Property and the bankruptcy court did not err in finding Charles had to turnover rent to the Trustee.

## CONCLUSION

In light of the foregoing, the Court **AFFIRMS** the bankruptcy court's judgment. **IT IS SO ORDERED.**

Dated: September 10, 2018

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge